IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)


STATE V. NICHOLAS C.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLANT,

V.

NICHOLAS C., APPELLEE.


Filed March 31, 2020.    No. A-19-1112.


Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Donald W. Kleine, Douglas County Attorney, and Desiree H. Stormont for appellant.

James Martin Davis for appellee.


MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

### INTRODUCTION

Nicholas C. was 16 years old when he was charged in the Douglas County District Court with assault in the first degree and use of a deadly weapon to commit a felony. He filed a motion to transfer the case to juvenile court, which was sustained. The State appeals, assigning error to the grant of the motion to transfer. Finding no abuse of discretion by the district court, we affirm.

### BACKGROUND

On December 13, 2018, the State filed an information charging Nicholas with assault in the first degree, in violation of Neb. Rev. Stat. § 28-308 (Reissue 2016), a Class II felony, and with use of a deadly weapon (not a firearm), to commit a felony, in violation of Neb. Rev. Stat. § 28-1205(1)(a) and (b), also a Class II felony. The information indicated that the event which

- 1 -

gave rise to the charges occurred in October 2018. In October 2018, Nicholas was 16 years 6 months old. He was born in April 2002.

On March 12, 2019, Nicholas filed a motion to transfer the matter to juvenile court under Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2018). In the motion, Nicholas alleged that transfer of the matter to juvenile court was warranted because he was only 16 years old; he lacked any previous criminal or juvenile court history; and he would be most amenable to the type of treatment provided by the juvenile court. Nicholas further alleged that his best interests would be served by transferring the case to juvenile court.

A juvenile transfer hearing was held on September 11, 2019. During this hearing, the State offered four exhibits: the police reports regarding the incident which gave rise to Nicholas' charges; video recordings of the incident; the medical records documenting the victim's injuries and recovery; and notes written by Nicholas when he was in the hospital recovering from his injuries.

The police reports and school surveillance video indicate that on the afternoon of October 9, 2018, Nicholas and his ex-girlfriend, L.P., were in band class in the basement of Burke High School. L.P., who was 15 years old at the time, left band class at some point to use the restroom. Nicholas followed L.P. and waited for her. When L.P. exited the restroom, she observed Nicholas in a nearby doorway. She tried to walk quickly away from him, but suddenly felt like someone had punched her in the back. She then realized that Nicholas had stabbed her. She tried to run away from Nicholas, but when she reached the end of the hallway, Nicholas caught her. At this point L.P. was facing him and he stabbed her in the stomach. L.P. stated that Nicholas tried to cut his throat at this point, but this action is not clearly seen in the surveillance video. L.P. again ran from Nicholas. She eventually ran toward a teacher who was in a nearby hallway. When Nicholas caught up to L.P. and the teacher, he again stabbed L.P. in the back. He cut his own throat with the knife he had used to stab L.P. Nicholas indicated that he wanted to die. The knife used by Nicholas is described as being a folding knife with a 3 1/2 inch blade which says "Silver Dollar City."

As a result of being stabbed in the back and the stomach, L.P. suffered from serious injuries, including a "through and through" liver laceration; a laceration to the pancreas; and a laceration to the colon. L.P. was hospitalized for approximately one month. When police interviewed L.P. in the hospital, she reported that she had ended her relationship with Nicholas during the summer of 2018. After the relationship ended, Nicholas continued to contact L.P., including, threatening to spread rumors about her to their mutual friends and threatening to harm himself. As a result of Nicholas' continued contact with L.P., counselors with Burke High School set up a meeting between Nicholas and L.P. in order to provide closure to their relationship. Nicholas' school counselor indicated that during this meeting, Nicholas did not appear to be angry with L.P. and L.P., eventually, agreed to forgive Nicholas for his actions. This meeting occurred on October 4, 2018, just five days before the stabbing incident. L.P. told police that Nicholas had never before threatened her with violence. However, she did indicate that he had talked about committing suicide even when they were still dating.

As a result of cutting his own throat, Nicholas underwent a tracheotomy and was hospitalized for approximately 3 1/2 weeks. Since being released from the hospital on October 26, 2018, he has been housed at the Douglas County Youth Center (Youth Center).

For much of the time Nicholas remained hospitalized, he was unable to speak, so he communicated with his parents and with care givers by writing messages down on pieces of paper. These written messages were collected by police and submitted into evidence at the transfer hearing. In many of the messages, Nicholas asks how L.P. is doing and inquires about how badly she was hurt. He expresses remorse for hurting her. In other messages, Nicholas expresses confusion about why he was allowed to live after hurting L.P. He continues to express a desire to see L.P. because he still loves her. In other messages, Nicholas asks what is going to happen to him and questions if the news media has reported on the incident. He also asks if he can have his video game system while in the hospital.

Nicholas' mother reported to police that Nicholas had been struggling with depression since July 2018, when his relationship with L.P. ended. Since that time, he had attempted to commit suicide by overdosing on medication and had been admitted to a psychiatric hospital on two separate occasions due to suicidal behavior. In September 2018, Nicholas wrote an essay expressing how much he was hurting after his relationship with L.P. ended. He indicated that he was struggling to find enjoyment in things and was concerned about having to give up being in the band. Nicholas' mother indicated that in October 2018, Nicholas was attending counseling two times per week and was taking medication for his depression.

After the State rested, Nicholas offered the testimony of James Mathisen, a clinical psychologist who conducted a mental health assessment of Nicholas in April 2019. In addition, Nicholas offered into evidence a copy of Mathisen's mental health report and a copy of a letter from Dr. Klaus Hartmann, who conducted a psychiatric evaluation of Nicholas on May 9, 2019, at the request of the State.

Mathisen is a clinical psychologist who spends a majority of his time working with youths. For the last 19 years, Mathisen has worked as a contractor with the Youth Center. During that time he has provided psychological services to approximately 20,000 youths who have been housed at the Youth Center. In this capacity, Mathisen has provided Nicholas with "crisis intervention" throughout the period he has been housed at the Youth Center. In addition, in April 2019, Mathisen evaluated Nicholas in order to provide an opinion about whether his criminal case should be transferred from the district court to the juvenile court.

In evaluating Nicholas, Mathisen found that Nicholas had no prior criminal history, nor did he exhibit any significant behavioral problems during his early childhood. However, Nicholas does have a history of mental health problems, in particular depression, beginning in elementary school. In fourth grade, Nicholas began engaging in therapy because he was having difficulty concentrating and was feeling depressed. Nicholas would go on to engage in mental health treatment off and on for the next seven years. By the time he entered high school, Nicholas had seen multiple mental health professionals, but continued to struggle with social anxiety and depression. In the tenth grade, Nicholas reported he would self-harm by cutting his leg or wrist with a pocket knife.

After Nicholas' relationship with L.P. ended during the summer of 2018, he became increasingly depressed and described himself as feeling "numb." In July 2018, he was admitted to a psychiatric hospital after he attempted to commit suicide by overdosing on medication. Nicholas told Mathisen that he "wanted to die to see what it was like" and that he "just wanted to see if [he]

would wake up or not." Nicholas also admitted to driving recklessly during this period of time. He explained that he would drive 80 miles an hour down a busy street and hope to lose control of his vehicle or to be killed by another vehicle. In September 2018, Nicholas was again admitted to a psychiatric hospital after putting a belt around his neck and sitting alone in his closet. Nicholas described that this suicide attempt was "more serious than the first." He told Mathisen that by this point in time he was obsessed with L.P. and their relationship. At the time of the stabbing in October 2019, Nicholas was attending therapy two times per week and was taking medication for his depression.

Ultimately, Mathisen diagnosed Nicholas as suffering from a severe major depressive disorder with psychotic features at the time of the incident in October 2019. Mathisen explained that "major depression" is "a very serious depression that occurs nearly every single day for [at least] a two week period." Symptoms of this disorder could include lethargy, problems with concentration, a depressed mood "nearly every single day," and suicidal ideation. Mathisen opined that Nicholas' ultimate motivation in committing the offense was his mental illness. Specifically, Mathisen explained that the offense was "psychotically motivated." Essentially, Nicholas was out of touch with reality during the incident in that neither his obsession nor his infatuation with L.P. was based in reality. And, although Mathisen recognized that the incident was somewhat premeditated, he also described the incident as an "impulsive action" by a teenager who could not fully contemplate the consequences. Additionally, Mathisen believed that when Nicholas cut his own throat after stabbing L.P., that he was genuinely trying to kill himself.

When Nicholas was transferred from the hospital to the Youth Center, he continued to be severely depressed and exhibited suicidal ideations. In fact, he was placed on suicide watch for his first month at the Youth Center because he was determined to be "high risk" for committing suicide. Nicholas also participated in mental health services on a daily basis. During his time at the Youth Center, Nicholas' condition has improved. Mathisen indicated that Nicholas has been compliant with medication management and that his therapy sessions have decreased to twice per week. Mathisen testified that Nicholas has responded "very well" to crisis intervention and his mood has improved. In addition, Mathisen opined that the psychotic features present in Nicholas' depressive disorder are currently in remission and Nicholas' mental health has become stabilized.

Mathisen described Nicholas' behavior while at the Youth Center as "exemplary." He is taking academic classes and is doing very well, even markedly improving his scores on standardized testing and earning enough credits to graduate from high school. Mathisen described Nicholas as highly motivated academically and as working toward a future. Nicholas has not had any major disciplinary issues while at the Youth Center and has maintained the highest rating for behavior for at least 5 months. In addition, he has become a leader within his unit, helping to serve meals and assisting with general cleaning responsibilities.

Mathisen testified that, in his opinion, Nicholas' criminal case should be transferred from the district court to the juvenile court. He noted that he recommends transfer to the juvenile court only about 20 to 25 percent of the time he is asked to provide such an opinion. Mathisen also noted that Nicholas is one of only two youths he has encountered at the Youth Center who Mathisen believed was truly motivated to change.

Mathisen did opine, however, that Nicholas will require a lengthy period of both inpatient and outpatient supervision. However, he believed that this treatment would be best obtained through juvenile court services. Mathisen stated: "[Nicholas'] needs are best met by psychiatric and psychotherapeutic interventions, not correctional approaches where he would have limited access to mental health care."

Mathisen recommended that Nicholas be placed at a psychiatric residential treatment facility which would provide mental health therapy as well as persistent and ongoing medication management. Mathisen testified that typically, youths such as Nicholas spend at least a year at a residential treatment facility. Eventually, Nicholas could obtain outpatient treatment upon re-entry into the community. Mathisen believed Nicholas should receive at least six months of continued monitoring after his release from inpatient treatment. While Mathisen agreed that Nicholas will certainly require mental health treatment beyond the time he reaches the age of majority, he also stated, "I'm pretty confident that in one year and seven months, [Nicholas] is going to do a lot -- a lot of good, and he's going to keep moving in a positive direction as he's been doing already." Mathisen did not believe that Nicholas was a danger to the public. He also believed that Nicholas had a "solid" family support system.

Mathisen went on to explain his opinion that being sentenced to a term of imprisonment would actually worsen Nicholas' condition. Mathisen believed that Nicholas would likely "decompensate or worsen" if sentenced to prison by the district court. In addition, Mathisen expressed concerns that Nicholas would commit suicide while in prison. Mathisen explicitly stated that Nicholas was the last person he would like to see go to prison.

In addition to Mathisen's testimony and report, at the transfer hearing Nicholas offered into evidence a copy of a letter written by Hartmann, who conducted a psychiatric evaluation of Nicholas on May 9, 2019, at the request of the State. Hartmann is a board certified forensic psychiatrist who is employed at the Lincoln Regional Center. The letter indicates that Hartmann agrees with Mathisen's opinion that Nicholas' criminal case should be transferred from the district court to the juvenile court. Hartmann wrote, "I believe [Nicholas] and society would be best served if his case were transferred to Juvenile Court." Hartmann opined that Nicholas should be placed in a psychiatric residential treatment facility with an appropriate safety and relapse prevention program "until he ages out."

In the letter, Hartmann provides the basis for his opinion as follows:

This young man has no prior criminal involvement and there is no history of drug or alcohol misuse. . . .

He has a lengthy history of depression and treatment over the years, which will need to continue for some time. He has been compliant with treatment and accepts the need for it. He has maintained a support system inasmuch as his mother visits him regularly and he is in contact with his father and classmates. He is considered to be rather fragile in view of his and his family's history. Placing him in an adult correctional setting would most probably be deleterious to him and amount to a major setback. At this time, he has reasonable goals for the future and appears determined to follow through. He expresses considerable remorse as to what has happened and it is evident that through psychotherapy,

he has learned from the experience. He voices no history of violence other than the index offense and is deemed to present no danger to society.

After the hearing, the district court entered a detailed order granting Nicholas' motion to transfer the matter to juvenile court. The court specifically iterated that it had carefully considered each of the factors set forth in Neb. Rev. Stat. § 43-276(1) (Reissue 2016) along with the opinions of Mathisen and Hartmann. The court explained:

That the charge involved in this matter does include extreme violence. As to motivation for the commission of the offense, the Court notes, as was testified to by the experts, this is inextricably intertwined with [Nicholas'] mental illness, including, but not limited to, major depression. The Court notes that at the time of this incident, [Nicholas] was 16 years of age as well as it appears that [L.P.] was also 16 [sic] years of age. The Court notes that [Nicholas] has no previous history of Juvenile Court involvement or any prior record whatsoever. The Court acknowledges the testimony of both experts that in their opinion, within a reasonable degree of psychological certainty, that it is in [Nicholas'] best interest for this matter to be transferred to the Juvenile Court. The Court acknowledges the issue of public safety being relevant but finds that in accepting the opinions of the two experts, as well as reviewing the criminal history of [Nicholas], the Court is not of great concern at this time about public safety. The Court further notes that this is a one-time incident. Both experts also testify that [Nicholas] has the ability and has demonstrated the ability to appreciate the nature and seriousness of his conduct. Pursuant to the testimony of the experts in this matter, as well as other evidence, the Court does believe, at this time and at least for some period going forward, the interest of [Nicholas] and the temporary security of the public does require [Nicholas] to continue in secured detention or, at a minimum, supervision but does not find that, at this time, this is necessary beyond his age of minority. The Court has no evidence as to whether or not [L.P.] agrees to participate in mediation. The Court notes that there is no firearm used in this offense and [Nicholas] has no history of use of or involvement with any firearms. There is no evidence that [Nicholas] is a member of any street gang.

Ultimately, the district court found that the State did not sufficiently demonstrate that there was a sound basis for not transferring the case to the juvenile court.

The State appeals from the district court's order.

## ASSIGNMENT OF ERROR

On appeal, the State assigns that the district court abused its discretion in transferring the case to juvenile court because a sound basis existed for retaining the matter in district court.

## STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Bluett*, 295 Neb. 369, 889 N.W.2d 83 (2016).

An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

LEGAL FRAMEWORK

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, both of the allegations against Nicholas put him within the second category of juvenile offenders. Nicholas was 16 years old at the time of the offenses. Both assault in the first degree and use of a deadly weapon (not a firearm) to commit a felony are Class II felonies. See §§ 28-308 and 28-1205(1)(b).

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to § 29-1816(3).

Under § 29-1816(3)(a) for motions to transfer a case from the county court or district court to juvenile court:

> The county court or district court shall schedule a hearing on such motion within fifteen days. . . . The criteria set forth in section 43-276 shall be considered at such hearing. After considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court[.]

At the outset, we note that the record in this case reveals that there was a long delay between the filing of the motion to transfer on March 13, 2019, and the hearing on the motion which was held on September 11, 2019. The record provided to us does not reveal why this delay occurred. However, we find this nearly six month delay concerning, particularly given the State's position that there was insufficient time to rehabilitate Nicholas as of the date of the transfer hearing.

The considerations in determining whether to transfer a case are set out in § 43-276:

> The county attorney or city attorney, in making the determination whether to file a criminal charge, file a juvenile court petition, offer juvenile pretrial diversion or mediation, or transfer a case to or from juvenile court, and the juvenile court, county court, or district court in making the determination whether to transfer a case, shall consider: (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure

detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in mediation; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

## DID DISTRICT COURT ABUSE ITS DISCRETION BY TRANSFERRING CASE TO JUVENILE COURT?

On appeal, the State contends that a sound basis existed for retaining the matter in district court. More specifically, the State argues that "[t]he extreme level of violence, the obvious public safety concerns, [Nicholas'] motive[,] and [his] age at the time of the offense all support retaining the matter in adult court." Brief for appellant at 12.

The Nebraska Supreme Court has stated that in deciding whether to grant the requested waiver and to transfer the proceedings to juvenile court, the court having jurisdiction over a pending criminal prosecution must carefully consider the juvenile's request in the light of the criteria or factors set forth in § 43-276. *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018). After the court considers the evidence in light of the § 43-276 factors, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court. See § 29-1816(3)(a). See also *State v. Tyler P., supra.* Thus, transfer in the absence of a sound basis for retention is the general rule. *State v. Tyler P., supra.* The burden of proving a sound basis for retention lies with the State. *Id.*

There is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. *Id.* Also, there are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified in the statute. *Id.* Rather, as the Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ "a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Stevens*, 290 Neb. 460, 465, 860 N.W.2d 717, 725 (2015).

In this case, based on the evidence considered by the district court, it found that there was not a sound basis to retain jurisdiction of Nicholas' criminal case. In reaching this decision, the district court appeared to rely heavily on the opinions of Mathisen and Hartmann that it would be in Nicholas' best interest to transfer the case to juvenile court. These opinions were based upon the marked improvement in Nicholas' mental health status after being placed at the Youth Center. The expert's opinions indicate that after undergoing mental health therapy and medication management at the Youth Center, Nicholas' mental health had stabilized, his psychotic tendencies were in remission, and he was able to focus on his future. Nicholas had readily applied himself to his academics and had displayed exemplary behavior. Both experts noted that Nicholas had learned from the incident and understood the need for further mental health treatment.

Moreover, and perhaps more importantly the district court explicitly indicated that it accepted the opinion of both Mathisen and Hartmann that Nicholas was not a threat to public safety, given that this was a one time event. Mathisen, in particular, opined that the motivation for Nicholas harming L.P. and himself was his mental illness and his psychotic symptoms. Because his symptoms had subsided, Mathisen did not believe that Nicholas posed any ongoing threat to the public. We note that it is clear that Nicholas has no previous criminal history or involvement with the juvenile court.

The district court also appeared to accept the experts' opinions that Nicholas should ultimately be placed in a psychiatric residential treatment facility rather than in an adult correctional setting and their opinions that Nicholas could receive beneficial treatment in the time period prior to reaching the age of majority. Both experts firmly believed that sentencing Nicholas to a term of imprisonment would be deleterious to Nicholas and the progress he has made.

Despite the opinions offered by Mathisen and Hartmann, we cannot ignore that Nicholas committed a very serious crime which involved a great deal of violence. Nicholas brought a knife to school, laid in wait for L.P., and then stabbed her multiple times before turning the knife on himself. We agree with the district court's statement that the video of this incident is "extremely disturbing" to watch.

In addition, we also cannot ignore that by the time of the transfer hearing, Nicholas was 17 years, 4 months old. As a result, there was only 1 year, 8 months until he turned 19 years old and aged out of the juvenile court system. This is not a long period of time, especially considering that Nicholas had been undergoing mental health treatment for a number of years prior to committing this offense. However we also note that Nicholas was approximately 16 1/2 years old at the time of the offense and had been in a controlled environment wherein he had received ongoing psychological intervention since his transfer from the hospital.

The seriousness of the offense and Nicholas' age both weigh in favor of retaining the case in the district court. However, these are only two of the factors listed in § 43-276 which need to be considered. And, based upon the opinions of Mathisen and Hartmann, many of the other factors listed therein weigh in favor of transferring the case to juvenile court. Such factors include Nicholas' lack of any criminal history or involvement in juvenile court; that his crime was attributable to his mental illness; that his mental health has since stabilized with treatment and medication management; that Nicholas understands the nature of his offense and has expressed remorse; and the experts' opinions that Nicholas does not pose a risk to the public and that transfer would be in his best interest. The experts also opined that Nicholas would be able to receive a sufficient amount of treatment in the limited time available before he reached 19 years of age. In analyzing these factors, we note that there were no conflicting expert opinions offered by the State. In fact, Mathisen is a clinical psychologist under contract to provide psychological services at the Youth Center. He testified to his extensive history with providing services to Nicholas. He also testified that historically, he recommended against transfer of cases to juvenile court 75 to 80 percent of the time. Hartmann is a forensic psychiatrist employed by the State. His evaluation was conducted following the court's granting of a motion filed by the county attorney's office specifically requesting an evaluation to be completed by the Lincoln Regional Center.

Our standard of review weighs heavily into our consideration of this case. We are not free to simply substitute our judgment for that of the district court. We are mindful that the district court had the opportunity to listen to the testimony presented first hand. We can only reverse the district court if we find that it abused its discretion. Our inquiry therefore is whether the district court's decision was based on reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

We are guided in our analysis by the recently decided case of *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018). In that case, the Supreme Court considered a case wherein the defendant, a juvenile at the time of the alleged offenses assaulted his father, pointed a gun at his mother, and eventually shot at Douglas County sheriff deputies before being shot by them. While there are a number of factual differences between the present case and *Tyler P.*, several similarities exist. There as here, the defendant had no criminal history. Expert testimony in that case related the defendant's violent outburst to a recently incurred head injury. After the district court transferred the case to juvenile court, the Supreme Court found that, given the standard of review, it could not find the district court's decision to constitute an abuse of discretion. We are similarly constrained.

Given our standard of review and the pertinent case law as expressed in *Tyler P.*, we conclude that the district court did not abuse its discretion in applying the balancing test in the light of the factors found in § 43-276 or in transferring Nicholas' criminal case to juvenile court. The district court's order clearly reveals that it carefully considered all of the relevant factors and relied a great deal on the uncontradicted opinions of both experts. We must give deference to the court's decisions regarding credibility and, given the abuse of discretion standard, we must give deference to the court's balancing of all of the information presented. We cannot find that the district court misapplied the general rule set forth by the Legislature under § 29-1816(3)(a) that the case "shall be transferred to juvenile court unless a sound basis exists for retaining the case" and that, when weighed against the evidence Nicholas presented at the hearing, the State failed to meet is burden to show a sound basis for retention.

CONCLUSION

For the reasons stated herein, we affirm the decision of the district court to transfer this matter to the juvenile court.

AFFIRMED.